## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JEANIE G.,[1]                          :    Case No. 2:24-cv-03711
                        :
       Plaintiff,              :    District Judge Michael H. Watson
                        :    Magistrate Judge Caroline H. Gentry
vs.                                    :
                        :
COMMISSIONER OF SOCIAL                 :
SECURITY,                              :
                        :
       Defendant.              :

---

## REPORT AND RECOMMENDATIONS[2]

---

Plaintiff filed an application for Supplemental Security Income (SSI) on March 17, 2017.[3] Plaintiff's claim was denied initially and upon reconsideration. After a hearing at Plaintiff's request, the Administrative Law Judge (ALJ) concluded that Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review. Plaintiff filed an action with this Court.[4] The Court remanded the case to the Commissioner under Sentence Four of 42 U.S.C. § 405(g), pursuant to a joint motion by the parties. The

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] *See* 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendations within the specified time period.

[3] Plaintiff asserts that she filed her application on March 21, 2017. (SE, Doc. No. 10 at PageID 1903.) However, the records indicate that Plaintiff's protective filing date is March 17, 2017. (*See, e.g.,* AR, Doc. No. 7-2 at PageID 41; Doc. No. 7-3 at PageID 271, 287.)

[4] Assigned to District Judge Edmund A. Sargus, Case Number 2:20-cv-02534.

Appeals Council remanded the case pursuant to the District Court's order. The ALJ held a hearing pursuant to the remand order and again concluded that Plaintiff was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review of that decision, and Plaintiff filed another action with this Court.[5] After briefing by the parties, the Court remanded the case to the Commissioner under Sentence Four of 42 U.S.C. § 405(g). The Appeals Council remanded pursuant to the District Court's order. A different ALJ held another hearing and, for a third time, concluded that Plaintiff was not under a "disability" as defined in the Social Security Act. After the Appeals Council denied Plaintiff's request for review of that decision, Plaintiff filed what is now her third action with this Court.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision. For the reasons set forth below, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED.

## I.   BACKGROUND

Plaintiff asserts that she has been under a disability since November 22, 2013.[6] She was thirty-eight years old on the SSI application date. Accordingly, Plaintiff was

---

[5] Assigned to District Judge Edmund A. Sargus, Case Number 2:21-cv-05445.

[6] Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. Thus, the relevant period of consideration in this case begins on March 17, 2017. *See* 20 C.F.R. § 416.335; *Koster v. Comm'r of Soc. Sec.*, 643 F. App'x 466, 478 (6th Cir. 2016) ("For purposes of SSI, which is not retroactive, the relevant period here is . . . the date [the plaintiff] filed his protective application.").

considered a "younger person" under the Social Security regulations. *See* 20 C.F.R. § 416.963(c). Plaintiff has a "high school education and above." *See* 20 C.F.R. § 404.1564(b)(4).

The evidence in the Administrative Record ("AR," Doc. No.  7) is summarized in the ALJ's decision ("Decision," Doc. No. 7-14 at PageID 1303-33), Plaintiff's Statement of Errors ("SE," Doc. No. 10), the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 12), and Plaintiff's Reply Memorandum ("Reply," Doc. No. 13). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II.    STANDARD OF REVIEW

The Social Security Administration provides SSI to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of

fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

4

where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III.    FACTS

### A.    The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's application for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 416.920.  The ALJ made the following findings of fact:

Step 1:    Plaintiff has not engaged in substantial gainful activity since March 17, 2017, the SSI application date.

Step 2:    She has the severe impairments of fibromyalgia and low back pain, arthritis of the bilateral knees, obesity, chronic obstructive pulmonary disease, deep vein thrombosis of the left lower extremity, persistent depressive disorder, bipolar I disorder, obsessive-compulsive disorder, and borderline intellectual functioning.

Step 3:    She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:    Her residual functional capacity (RFC), or the most she can do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of medium work as defined in 20 C.F.R. § 416.967(c), subject to the following limitations: [Plaintiff] can occasionally climb ramps and stairs but is unable to climb ladders, ropes, or scaffolds. [Plaintiff] can occasionally balance, stoop, kneel, crouch, and crawl. [Plaintiff] is unable to work at unprotected heights or work around hazardous machinery nor able to perform commercial driving. [Plaintiff] must avoid concentrated exposure to extreme cold, heat, humidity, wetness, pulmonary

5

irritants, and vibration. [Plaintiff] can perform simple, routine, and repetitive tasks, with no fast- paced production such as assembly line work or work where a machine sets the pace, rather work should be of a variable rate. [Plaintiff] can have no strict production or hourly requirements, rather should have end of day work goals. [Plaintiff] cannot work with the general public as part of routine job duties, but can have occasional interaction with coworkers and supervisors, with no tandem routine job tasks with coworkers, rather work should be more independent in and around proximity of others. Furthermore, during the occasional interactions defined as [one-third] of the workday, [Plaintiff] can engage in job-task based and job-related communication, of [two to three] minutes at one time.

She is unable to perform any of her past relevant work.

Step 5:    Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform.

(Decision, Doc. No. 7-14 at PageID 1309-25.) These findings led the ALJ to conclude that Plaintiff does not meet the definition of disability and so is not entitled to benefits. (*Id.* at PageID 1325.)

## B.    Physician Assistant Fred Corder, P.A.-C.

Fred Corder, P.A.-C. completed a Medical Source Statement As To Ability To Perform Work Related Activities (Mental) questionnaire in November 2018. (AR, Doc. No. 7-7 at PageID 762-64.) Using checkmarks, P.A. Corder estimated that Plaintiff experienced extreme impairment (defined as "unable to function in this area over [fifty percent] of the work day or work week") in the following abilities: relating to the general public and maintaining socially-appropriate behavior; performing and completing work tasks in a normal workday or workweek at a consistent pace; processing subjective information accurately and using appropriate judgment; carrying through instructions and

completing tasks independently; maintaining attention and concentration for more than brief periods of time; performing at production levels expected by most employers; and tolerating customary work pressures. (*Id.* at PageID 762-63.)

P.A. Corder also used checkmarks to opine that Plaintiff experienced marked impairment (defined as "unable to function in this area from [twenty-six percent] to [fifty percent] of the work day or work week") in the areas of: working in coordination with or proximity to others without distracting them or exhibiting behavioral extremes; responding appropriately to coworkers or peers; working in cooperation with or in proximity to others without being distracted by them; responding appropriately to changes in the work setting; remembering locations, workday procedures, and instructions; being aware of normal hazards and taking necessary precautions; and behaving predictably, reliably, and in an emotionally-stable manner. (*Id.*) P.A. Corder indicated moderate impairment (defined as "unable to function in this area from [eleven percent] to [twenty-five percent] of the work day or work week") in the areas of accepting instruction from or responding appropriately to criticism from supervisors, and maintaining personal appearance and hygiene. (*Id.* at PageID 762-63.)

P.A. Corder indicated that his opinion regarding Plaintiff's social limitations would not change even "if only minimal contact or interaction with others is required." (AR, Doc. No. 7-7 at PageID 762.) He also opined that Plaintiff would "likely have partial or full[-]day unscheduled absences from work occurring [five] or more days per month" and that Plaintiff's condition would likely deteriorate if she was "placed under stress, particularly the stress of an [eight-]hour per day, [eight-]day per week job." (*Id.* at

PageID 764.) P.A. Corder explained: "[P]rone to workplace injury. Unable to read or write." (*Id.*) P.A. Corder also indicated that the assessed limitations had persisted since the alleged disability onset date of November 22, 2013, explaining: "[L]earning disabilities [and] special ed[ucation] classes while in school." (*Id.*) When asked to note any other work-related limitations, P.A. Corder wrote: "[W]ork capacity extremely low due to lack of communication and education deficits." (*Id.*)

P.A. Corder also completed a Medical Source Statement About What the Claimant Can Still Do Despite Impairment(s) form in November 2018. (AR, Doc. No. 7-7 at PageID 765-67.) P.A. Corder used checkmarks to indicate his opinion that Plaintiff could rarely lift and carry up to twenty pounds and occasionally lift and carry up to ten pounds. (*Id.* at PageID 765.) He indicated that Plaintiff could occasionally use her upper extremities for reaching, handling, and fingering. (*Id.* at PageID 765-66.) P.A. Corder opined that Plaintiff could stand and walk for ten minutes at a time and a total of thirty minutes per day, and sit for thirty minutes at a time and a total of two hours per day. (*Id.* at PageID 766.) According to P.A. Corder, Plaintiff could never crouch, squat, crawl, or climb ladders, and occasionally bend or climb steps, due to leg and knee pain. (*Id.*)

P.A. Corder placed a checkmark to indicate that Plaintiff's condition would likely "deteriorate if placed under stress, particularly stress associated with a job." (AR, Doc. No. 7-7 at PageID 766.) He indicated that the assessed limitations had persisted since November 22, 2013. (*Id.* at PageID 767.) P.A. Corder again indicated that Plaintiff would "likely have partial or full[-]day unscheduled absences from work occurring [five] or more days per month." (*Id.*) When asked to identify Plaintiff's diagnoses, P.A. Corder

wrote: "bipolar depression, [obsessive-compulsive disorder], [dysfunctional uterine bleeding], Raynaud syndrome, fibromyalgia, chronic back pain, asthma, history [of] deep vein thrombosis, [and] illiteracy." (*Id.*)

The ALJ assigned little weight to P.A. Corder's opinion. (Decision, Doc. No. 7-14 at PageID 1322.) The ALJ explained: "[S]aid opinion is neither consistent with nor supported by the totality of the evidence, which documents the history of conservative care for [Plaintiff's] severe impairments. Further, the undersigned notes that the record fails to document recurring emergency care or inpatient hospitalizations." (*Id.*) The ALJ also noted that "the determination of disability is a matter reserved to the Commissioner." (*Id.*) Additionally, the ALJ commented on the limitations that she included in the RFC:

> Alternatively, the undersigned finds that the limitations found within the above-stated residual functional capacity adequately account for and accommodate the limitations resulting from [Plaintiff's] severe impairments by limiting the nature and complexity of her work activities, and the nature and frequency of her interactions with others in the workplace, as stated therein, due to the combined effects of her severe impairments, which significantly impact her ability to perform competitive work activity. As noted above, greatest deference to [Plaintiff's] mental residual functional capacity is given to Dr. Lace's testimony.

(*Id.*)

## C.  Jason Seckman, A.P.R.N.-C.N.P.

Jason Seckman, A.P.R.N.-C.N.P. completed a Medical Source Statement About What the Claimant Can Still Do Despite Impairment(s) form in January 2019. (AR, Doc. No. 7-7 at PageID 771-73.) Nurse Seckman stated that he was a psychiatric nurse practitioner and treated Plaintiff for a moderate bipolar disorder "that [was] in near remission of symptoms." (*Id.* at PageID 773.) He opined that "[s]ymptoms related to

9

[Plaintiff's] mental health disorder cause[d] minor to moderate impairment[s] that are exacerbated from stress that [were] short in duration." (*Id.*) Nurse Seckman indicated that he could not complete the rest of the form because he did not treat Plaintiff's physical conditions. (*Id.*)

Nurse Seckman also completed one page of a Medical Source Statement As To Ability To Perform Work Related Activities (Mental) questionnaire in January 2019. (AR, Doc. No. 7-7 at PageID 774.) Nurse Seckman used checkmarks to indicate his opinion that Plaintiff experienced moderate impairment (defined as "unable to function in this area from [eleven percent] to [twenty-five percent] of the work day or work week") in all areas of social functioning that were listed on the form. (*Id.*) When asked to explain the assessed social limitations, Nurse Seckman stated: "Struggles w[ith] comprehension that is exacerbated in social settings." (*Id.*)

The ALJ afforded great weight to Nurse Seckman's opinions. (Decision, Doc. No. 7-14 at PageID 1323.) The ALJ reasoned that the opinions were "consistent with and supported by the history of conservative care documented in the record," but noted that "the probative value of the opinion is limited, as [Nurse Seckman] failed to provide a detailed function-by-function analysis of limitations resulting from [Plaintiff's] severe impairments." (*Id.* at PageID 1323.) Additionally, the ALJ commented:

> Moreover, the undersigned finds that the mental limitations found within the above-stated residual functional capacity adequately account for and accommodate the functional limitations resulting from [Plaintiff's] severe mental impairments by limiting the nature and complexity of her work activities and the nature and frequency of her interactions with others, as stated therein.

10

(*Id.*)

### D.     State Agency Psychological Consultants

State agency psychological consultant Jennifer Swain, Psy.D. completed a Disability Determination Explanation form in June 2017. (AR, Doc. No. 7-3 at PageID 271-84.) Dr. Swain found moderate impairment in all four of the "B Criteria" areas of functioning. (*Id.* at PageID 278.) In the mental RFC section of the form, Dr. Swain opined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, and that Plaintiff could "only understand and remember simple[,] one[-]step tasks." (*Id.* at PageID 282.) Dr. Swain noted: "B[orderline intellectual functioning.] [R]ecall [one of three] words after delay." (*Id.*) She also cited Plaintiff's intelligence testing scores. (*Id.*)

In the area of sustained concentration and persistence, Dr. Swain found moderate limitation in Plaintiff's ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (AR, Doc. No. 7-3 at PageID 283.) Dr. Swain opined that Plaintiff could carry out simple, one- to two-step tasks. (*Id.*) She noted that Plaintiff "reports … difficulty sustaining concentration." (*Id.*) As for social interaction, Dr. Swain opined that Plaintiff was moderately limited in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) According to Dr. Swain, Plaintiff could "interact with small groups of people superficially" but would "have trouble responding to any complex supervisor feedback." (*Id.*)

In the final area of adaptation, Dr. Swain opined that Plaintiff was moderately limited in the ability to respond appropriately to changes in the work setting. (AR, Doc. No. 7-3 at PageID 283.) She opined that Plaintiff could "work in an environment where conditions are static and changes are infrequent." (*Id.*) Dr. Swain explained: "[Plaintiff's] depressive [symptoms] will limit her ability to cope." (*Id.*)

Tonnie Hoyle, Psy.D. reviewed the updated record at the reconsideration level in August 2017. (AR, Doc. No. 7-3 at PageID 288-98.) Dr. Hoyle affirmed Dr. Swain's assessment. (*Id.*)

The ALJ assigned some weight to the findings of the state agency psychological consultants. (Decision, Doc. No. 7-14 at PageID 1320.) The ALJ reasoned that the opinions were "generally consistent with and supported by the totality of the record, which documents a history of conservative care for [Plaintiff's] severe mental impairments." (*Id.*) The ALJ also explained:

> While the undersigned has incorporated limitations with respect to simple, routine, and repetitive tasks, has [sic] limited [Plaintiff's] working environment to accommodate static work environment and infrequent changes, the undersigned has not incorporated the assessed social limitations. The undersigned notes that the term "superficial" is undefined in [the] consultant's assessments and is a nonspecific qualifying term that does not adequately describe function consistent with applicable policy and/or regulation nor usefully conveys the extent of [Plaintiff's] vocationally relevant limitations.

(*Id.*) The ALJ again referenced the testimony of the psychological medical expert: "Furthermore, with respect to the more complete review completed by psychological expert Dr. Lace, the undersigned has assigned his testimony as it relates to [Plaintiff's] mental health related functional limitations greater weight." (*Id.*)

12

## IV.   LAW AND ANALYSIS

Plaintiff asserts three errors: 1) the ALJ failed to properly evaluate the medical opinions from treating physician assistant Fred Corder; 2) the ALJ's RFC does not account for psychiatric nurse practitioner Jason Seckman's opined limitations; and 3) the ALJ failed to account for the state agency psychological consultants' opinions. (SE, Doc. No. 10 at PageID 1911-19.) For the reasons discussed below, the undersigned does not find these contentions to be well-taken and therefore recommends that the ALJ's decision be affirmed.

### A.   Applicable Law

A claimant's RFC describes the most that she can do in a work setting despite her physical and mental limitations. 20 C.F.R. § 416.945(a)(1). The ALJ is responsible for determining a claimant's RFC. 20 C.F.R. § 416.927(d)(2) (the final responsibility for deciding the RFC "is reserved to the Commissioner."); 20 C.F.R. § 416.946(c); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("[T]he ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an 'assessment of his [RFC].'"). When formulating the RFC, the ALJ must consider the "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 416.945(a)(4). The ALJ must base the RFC on all relevant evidence in the record, including the claimant's descriptions of her limitations and symptoms, objective medical evidence, medical opinions, other medical evidence, evidence from non-medical sources, and prior administrative medical findings. 20 C.F.R. § 416.945(a)(1)-(5).

13

Because Plaintiff's claim was filed before March 27, 2017, the opinion evidence rules in 20 C.F.R. § 404.1527 apply. The ALJ must consider and evaluate every medical opinion in the record. *See* 20 C.F.R. § 404.1527(b), (c). However, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citations omitted). Under the treating physician rule, "[t]reating-source opinions[7] must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).

"If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Wilson v. Comm'r of Soc. Sec*, 378 F.3d 541, 544 (6th Cir. 2004)). An ALJ's failure to balance these factors and assign a specific weight "alone

---

[7] A "treating source" is a claimant's "own acceptable medical source who provides … medical treatment or evaluation and who has … an ongoing treatment relationship" with a claimant. 20 C.F.R. § 404.1527(a)(1).

14

constitutes error, as 'a finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected." *Cole*, 661 F.3d at 938 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

"Separate from the treating physician rule, but closely related, is the requirement that the ALJ 'always give good reasons' for the weight ascribed to a treating-source opinion." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2); other citation omitted)); *see Wilson*, 378 F.3d at 544. "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Cole*, 661 F.3d at 937 (quoting SSR 96-2p, 1996 SSR LEXIS 9, at *12 (July 2, 1996)).[8] For example, "an ALJ may not summarily discount a treating-source opinion as not well-supported by objective findings or being inconsistent with the record without identifying and explaining how the substantial evidence is purportedly inconsistent with the treating-source opinion." *Hargett*, 964 F.3d at 552.

The Sixth Circuit has explained that "[t]he point of the 'good reasons' rule is to permit meaningful review of the ALJ's decision and to ensure that a claimant is not 'bewildered' when an administrative bureaucracy tells him that he is not disabled." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017) (citations omitted).

---

[8] SSR 96-2p has been rescinded. However, this rescission is effective only for claims filed on or after March 27, 2017. See SSR 96-2p, 2017 WL 3928298 at *1. Because Plaintiff filed her application for benefits prior to March 27, 2017, SSR 96-2p still applies in this case.

Given the importance of this rationale, a violation of the good reasons rule will "denote a lack of substantial evidence" that justifies reversal unless the error is harmless:[9]

> Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.

*Rogers*, 486 F.3d at 243. Courts in the Sixth Circuit therefore "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion." *Wilson*, 378 F.3d at 545.

### B. The ALJ Did Not Err In Her Analysis Of P.A. Corder's Opinions.

As a physician assistant, P.A. Corder is not an "acceptable medical source" as defined in 20 C.F.R. § 416.902(a). *See* SSR 06-03p, 2006 WL 2329939, *1 (Aug. 9, 2006); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 n.9 (6th Cir. 2016). He is also not a "treating source" under 20 C.F.R. § 416.927(a)(1), and his opinion is not entitled to controlling or deferential weight. 20 C.F.R. § 416.927(c)(2); SSR 06-03p at *2. Nevertheless, he is a licensed healthcare worker and so is a "medical source" whose opinion should be considered using the factors in 20 C.F.R. § 416.927(c). *See* 20 C.F.R. § 416.927(f); SSR 06-03p at *2-3.

---

[9] "[A] failure to give good reasons could constitute harmless error . . . where 'a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it,' or where the Commissioner made 'findings consistent with the [treating-source] opinion' or where the purposes of notice and ability for meaningful review have been satisfied." *Hargett*, 964 F.3d at 554 (quoting *Wilson*, 378 F.3d at 547).

Plaintiff contends that "the ALJ did not provide any sort of actual analysis of those opinions," the analysis "can be boiled down to buzz words or phrases," and the ALJ "did not even cite to a single piece of actual evidence in the record." (SE, Doc. No. 10 at PageID 1913.) The undersigned disagrees, as the ALJ's explanation for assigning little weight to P.A. Corder's opinions is clearly articulated and supported by substantial evidence. The ALJ also addressed the required supportability and consistency factors when she found that P.A. Corder's opinions were "neither consistent with nor supported by the totality of the evidence, which documents the history of conservative care for [Plaintiff's] severe impairments." (Decision, Doc. No. 7-14 at PageID 1322.)

The ALJ summarized the medical records related to Plaintiff's physical and mental impairments both at Step 3 and in the RFC analysis, with citations to the record. (Decision, Doc. No. 7-14 at PageID 1309-19.) The ALJ also summarized Plaintiff's treatment for her physical and mental complaints. (*Id.* at PageID 1314-19.) The Court may consider these summaries when evaluating whether the ALJ's analysis of a provider's opinion satisfies the supportability and consistency requirements. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (although the ALJ did not "reproduce the list of [the plaintiff's] treatment records a second time" to support her consistency analysis, "it suffices that she listed them elsewhere in her opinion."); *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-66 (6th Cir. 2014) (finding that the ALJ made "sufficient factual findings elsewhere in his decision to support his conclusion at step three); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (looking to

17

findings elsewhere in the decision to affirm the ALJ's step three analysis, and finding no need for the ALJ to "spell out every fact a second time").

These summaries satisfy the supportability and consistency requirements for the ALJ's analysis of P.A. Corder's opinion. The ALJ acknowledged that Plaintiff's BMI in the treatment notes exceeded 30, which indicated obesity. (Decision, Doc. No. 7-14 at PageID 1310, 1316, 1319 (citing, e.g., AR, Doc. No. 7-19 at PageID 1610; AR, Doc. No. 7-20 at PageID 1766).) With respect to Plaintiff's fibromyalgia, low back pain, and bilateral knee arthritis, the ALJ acknowledged that Plaintiff sought treatment at a pain clinic, where providers prescribed medication for her complaints of pain in multiple joints. (Decision, Doc. No. 7-14 at PageID 1315-16 (citing, generally, AR, Doc. No. 7-7 at PageID 693-748; AR, Doc. No. 7-13 at PageID 1176-1211, 1297-1301; AR, Doc. No. 7-20 at PageID 1759-895).) The ALJ also acknowledged that some physical examinations showed abnormal findings such as posterior knee tenderness with palpation, positive Phalen's testing, and Tinel's sign in the right wrist. (*Id.* at PageID 1314-16 (citing AR, Doc. No. 7-7 at PageID 524; AR, Doc. No. 7-19 at PageID 1612).) The ALJ compared this evidence to other records that documented normal physical examination findings. (*Id.* at PageID 1315-16 (citing AR, Doc. No. 7-7 at PageID 562-63, 626; AR, Doc. No. 7-13 at PageID 7-13 at PageID 986-88).)

With regard to Plaintiff's complaints of leg pain and swelling, the ALJ cited an August 2014 left leg ultrasound that showed superficial vein thrombosis but no evidence of deep vein thrombosis. (*Id.* at PageID 1314 (citing AR, Doc. No. 7-7 at PageID 541).) The ALJ also cited a May 2018 left lower extremity venous study that showed acute deep

vein thrombosis of the distal posterior tibial vein and acute superficial thrombophlebitis of the left lower extremity. (*Id.* (citing AR, Doc. No. 7-7 at PageID 624-25).) The ALJ stated that although emergency room providers diagnosed left leg deep vein thrombosis when Plaintiff presented to an emergency department in August 2019, a bilateral lower extremity ultrasound that was performed several days later showed only some bilateral reflux and no evidence of deep vein thrombosis. (Decision, Doc. No. 7-14 at PageID 1315 (citing AR, Doc. No. 7-13 at PageID 983-88, 1154-56).)

The ALJ also cited a June 2020 bilateral lower extremity venous insufficiency study that showed findings consistent with significant venous insufficiency in the bilateral lower extremities, and acknowledged that Plaintiff's providers noted that she was a possible candidate for endovenous therapy. (Decision, Doc. No. 7-14 at PageID 1316 (citing AR, Doc. No. 7-13 at PageID 1167-68).) The ALJ compared this evidence to a July 2022 bilateral lower extremity ultrasound that again showed reflux but showed no evidence of deep vein thrombosis. (*Id.* (citing AR, Doc. No. 7-19 at PageID 1755-57).) The ALJ pointed out that only in April 2022 did an examination show venous changes of the lower extremities. (*Id.* (citing AR, Doc. No. 7-19 at PageID 1617).) As noted above, the ALJ also stated that several physical examinations that were performed since the application date were normal. (*Id.* at PageID 1315-16 (citing AR, Doc. No. 7-7 at PageID 562-63, 626; AR, Doc. No. 7-13 at 7-13 at PageID 986-88).)

With regard to Plaintiff's shortness of breath complaints, the ALJ acknowledged that Plaintiff's primary care providers documented some abnormal examination findings such as decreased air movement, decreased breath sounds, occasional coughing, and mild

wheezing. (Decision, Doc. No. 7-14 at PageID 1316 (citing AR, Doc. No. 7-19 at PageID 1610-13, 1632-34).) The ALJ acknowledged that Plaintiff reported using Albuterol approximately twice per week. (*Id.* at PageID 1317 (citing AR, Doc. No. 7-19 at PageID 1664, 1720).) However, the ALJ also noted that Plaintiff's providers documented these findings "in the context of a history of [a] COVID infection and a significant history of tobacco use," or after Plaintiff reported "push mowing the week prior and . . . exposure to others who were ill." (*Id.*) Additionally, the ALJ noted that Plaintiff's provider reported in March 2024 that Plaintiff's chronic conditions—including her shortness of breath— were stable. (*Id.* (citing AR, Doc. No 7-19 at PageID 1722).)

Turning to Plaintiff's mental impairments, the ALJ acknowledged many of Plaintiff's subjective complaints, including anxiety, difficulty being around other people, and panic attacks outside of her home. (Decision, Doc. No. 7-14 at PageID 1313.) The ALJ incorporated by reference a prior ALJ's summary of Plaintiff's testimony, which included complaints of crying spells, problems with memory and concentration, social anxiety, daily panic attacks, and sleep difficulties. (*Id.* (citing AR, Doc. No. 7-15 at PageID 1383).) The ALJ also summarized medical records that documented Plaintiff's treatment for her mental impairments. (*Id.* at PageID 1317-19.) She acknowledged Plaintiff's complaints in the treatment notes, which included "feeling down," struggling with grief, and stressors related to family conflicts. (*Id.* (citing AR, Doc. No. 7-7 at PageID 750; AR, Doc. No. 7-13 at PageID 1046; AR, Doc. No. 7-19 at PageID 1568, 1590, 1715-16).) The ALJ also acknowledged the abnormal findings in the treatment notes, which included a depressed or dysphoric mood, a blunted mood and affect, and

20

limited insight on some occasions. (*Id.* (citing, e.g., AR, Doc. No. 7-19 at PageID 1595, 1704, 1706-07).) The ALJ also acknowledged the intelligence testing scores that consultative psychologist Amynda Rhodes, Psy.D. reported in her January 2014 consultative evaluation report, which "plac[ed] [Plaintiff] in the very low range to borderline range" of intelligence." (*Id.* at PageID 1321 (citing AR, Doc. No. 7-7 at PageID 470-71).) The ALJ further cited the abnormal findings that Christopher Ward, Ph.D. documented during the May 2017 consultative evaluation, which included a depressed presentation. (*Id.* (citing AR, Doc. No. 7-7 at PageID 573-79).)

The ALJ compared these findings to many other examinations throughout the record that were normal and showed no significant mental status abnormalities. (Decision, Doc. No. 7-14 at PageID 1317-19 (citing, e.g., AR, Doc. No. 7-7 at PageID 473-512, 597-98, 608-09, 755-56; AR, Doc. No. 7-13 at PageID 1017-106, 1219, 1230-31, 1241-42, 1252, 1263, 1273-74, 1291; AR, Doc. No. 7-19 at PageID 1554-64, 1693-94).) The ALJ also cited Plaintiff's statements to her providers that her conservative treatment was generally effective. (*Id.*) For example, Plaintiff stated in November 2018 that her "mood swings were stable, less frequent, and less severe, and [] that Zoloft help[ed] with anxiety." (*Id.* at PageID 1317 (citing AR, Doc. No. 7-13 at PageID 1096).) An October 2020 progress note documented Plaintiff's report that "she benefit[ted] from medications for bipolar disorder, as her mood swings were less severe and less frequent." (*Id.* at PageID 1318 (citing (AR, Doc. No. 7-13 at PageID 1225).) Plaintiff stated in May and October 2021 that she was "doing well" on medications and her bipolar symptoms

were "less severe and less frequent." (*Id.* (citing AR, Doc. No. 7-13 at PageID 1286; AR, Doc. No. 7-19 at PageID 1590).)

In July 2022, Plaintiff reported "fewer and less severe mood swings, as well as not feeling down like she did …." (Decision, Doc. No. 7-14 at PageID 1318 (citing AR, Doc. No. 7-19 at PageID 1554-64).) Plaintiff reported in May 2023 that she was "doing well with Zoloft, with her OCD symptoms under control, no reported depression, [and] controlled anxiety, albeit with a little stress due to spending nights at the hospital with her maternal aunt …." (*Id.* (citing AR, Doc. No. 7-19 at PageID 1521).) The ALJ acknowledged that Plaintiff's provider increased her medication dosage in September 2023. (*Id.* (citing AR, Doc. No. 7-19 at PageID 1699).) However, by November 2023, Plaintiff denied depression and anxiety symptoms and said she was "'doing a lot better,' with greatly diminished mood swings, no anxiety attacks, and indicating that her medications were effective without side effects." (*Id.* (citing AR, Doc. No. 7-19 at PageID 1706).) Finally, although Plaintiff reported "a difficult transition with having to move back in with her mother" in February 2024, she "continued to report happiness with her progress and that her depression and anxiety [were] 'in check.'" (*Id.* at PageID 1319 (citing AR, Doc. No. 7-19 at PageID 1715-16).)

The ALJ concluded that the balance of the objective evidence did not support Plaintiff's allegations of disabling symptoms. (Decision, Doc. No. 7-14 at PageID 1319-20.) The ALJ nevertheless accounted for this evidence by limiting Plaintiff to the range of medium-exertion work that involves simple, routine tasks with the additional social limitations as identified in the RFC.

The undersigned finds that substantial evidence supports the ALJ's conclusion that P.A. Corder's opinions were entitled to little weight. Although the record does contain some objective and clinical medical findings that provide support for P.A. Corder's opinion, the ALJ appropriately acknowledged and evaluated these findings in her decision. The ALJ compared the evidence supporting P.A. Corder's opinions to contradictory examination findings and objective testing in the record and concluded that the balance of the evidence did not support P.A. Corder's opinions. Because substantial evidence supports the ALJ's conclusion, Plaintiff's assignment of error is not well-taken.

**C.    The ALJ's Conclusions Regarding Psychiatric Nurse Practitioner Jason Seckman's Opinions Are Supported By Substantial Evidence, And The ALJ Did Not Err By Failing To Include Additional Mental Limitations In The RFC.**

As a nurse practitioner, Nurse Seckman is not an "acceptable medical source" as defined in 20 C.F.R. § 416.902(a). *See* SSR 06-03p, 2006 WL 2329939, *1 (Aug. 9, 2006); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 n.9 (6th Cir. 2016). He is also not a "treating source" under 20 C.F.R. § 416.927(a)(1), and his opinion is not entitled to controlling or deferential weight. 20 C.F.R. § 416.927(c)(2); SSR 06-03p at *2. Nevertheless, he is a licensed healthcare worker and so is a "medical source" whose opinion should be considered using the factors in 20 C.F.R. § 416.927(c). *See* 20 C.F.R. § 416.927(f); SSR 06-03p at *2-3.

Plaintiff asserts that the ALJ erred because although she gave "great weight" to Nurse Seckman's opinions, she "claimed that the probative value was decreased as Mr. Seckman did not provide a function-by-function assessment." (SE, Doc. No. 10 at

23

PageID 1916-17; Reply, Doc. No. 13 at PageID 1939-41.) Plaintiff also argues that "the ALJ violated SSR 96-8p by failing to explain why so many of Mr. Seckman's opinions were left out of the [RFC]." (SE, Doc. No. 10 at PageID 1917.) The undersigned concludes that these contentions are not well-taken.

The ALJ assigned "great weight" to Nurse Seckman's opinion but noted that "the probative value of the opinion is limited" due to the absence of a function-by-function analysis. (Decision, Doc. No. 7-14 at PageID 1323.) It is true that the applicable Social Security regulations and rulings do not require that a medical source opinion include a "function-by-function" analysis to be acceptable. *See Rivers v. Astrue*, No. 1:08-cv-1824, 2009 WL 1160259, at *15–16 (N.D. Ill. Apr. 29, 2009) (medical sources are not required to provide detailed function-by-function RFCs). Nevertheless, they also do not prohibit an ALJ from concluding that an opinion is less probative if it does not include a function-by-function analysis. Therefore, this argument is not well-taken.

Next, Plaintiff argues that the ALJ failed to account for Nurse Seckman's opinions because the ALJ's RFC limitations were less restrictive than those required by Nurse Seckman's opinion in two respects, and the ALJ failed to explain why she did not include such limitations. (SE, Doc. No. 10 at PageID 1917.) This argument is also not well-taken.

Plaintiff first contends that the ALJ's RFC limitations do not account for Nurse Seckman's opinion that Plaintiff was moderately limited in the ability to accept instructions or respond appropriately to criticism from supervisors. (Reply, Doc. No. 13 at PageID 1941.) The relevant language in the RFC provided:

24

> The claimant cannot work with the general public as part of routine job duties, but can have occasional interaction with coworkers and supervisors, with no tandem routine job tasks with coworkers, rather work should be more independent in and around proximity of others. Furthermore, during the occasional interactions defined as 1/3 of the workday, the claimant can engage in job-task based and job-related communication, of 2-3 minutes at one time.

(Decision, Doc. No. 7-14 at PageID 1312-13.) The undersigned concludes that these RFC limitations adequately account for Nurse Seckman's opinion.

As an initial matter, it is important to emphasize that the ALJ was not required to adopt Nurse Seckman's opinion wholesale. The RFC is not required to "recite medical opinions verbatim[;] rather the ALJ is responsible for translating and incorporating medical findings into a succinct RFC." *McIntosh v. Colvin*, No. 16-cv-0963-JAH-BGS, 2018 U.S. Dist. LEXIS 30778, at *15 (S.D. Cal. Feb. 26, 2018) (citation omitted); *c.f. Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("Although the ALJ may not substitute his opinions for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding.").

Here, the ALJ's above-quoted RFC limitations account for Plaintiff's moderate limitations in social functioning. Courts have held that similar RFCs adequately account for moderate limitations in the ability to accept instructions and respond appropriately to criticism from supervisors. *See, e.g., Watt v. Comm'r of Soc. Sec.*, No. 3:22-CV-01827-JGC, 2023 U.S. Dist. LEXIS 196249, at *24 (N.D. Ohio, Oct. 5, 2023) (RFC limitation for "occasional interaction" with the general public, coworkers, and supervisors accounted for the plaintiff's moderate limitation in his ability to interact with others); *Schaefer v. Comm'r of Soc. Sec.*, No. 13-10105, 2014 WL 562436, at *14 (E.D. Mich.

Feb. 13, 2014) (RFC limitation for "occasional contact with co-workers and the general public" sufficiently accommodated the plaintiff's moderate limitations in social functioning, including moderate limitation in the ability to respond appropriately to criticism from supervisors); *McIntosh v. Colvin*, No. 16-cv-0963-JAH-BGS, 2018 U.S. Dist. LEXIS 30778, at *16 (S.D. Cal. Feb. 26, 2018) (RFC limitation for "occasional interaction with co-workers and supervisors" accounted for evaluating psychologist's opinion that plaintiff had moderate difficulty in his ability to interact with co-workers and supervisors, as well as consultative psychologists' opinion that plaintiff had moderate limitations in accepting instructions and responding appropriately to criticism from supervisors); *Brill v. Saul*, No. 3:20-CV-05064-NKL, 2021 WL 5157488, at *5-6 (W.D. Mo. Nov. 5, 2021) ("RFC [that included a limitation for occasional interaction with supervisors] does not deviate from [treating nurse's] opinion that [the plaintiff] was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors").

In addition, the undersigned notes that although Plaintiff testified that she became nervous and agitated around other people, she did not describe significant issues with supervisors. (*See, e.g.,* AR, Doc. No. 7-2 at PageID 246-69; AR, Doc. No. 7-8 at PageID 805-23; AR, Doc. No. 7-14 at PageID 1335-54.)

Next, Plaintiff contends that the ALJ's RFC does not account for Nurse Seckman's opinion that Plaintiff was moderately limited (defined on the form as "unable to function in this area from [eleven percent] to [twenty-five percent] of the work day or work week") in the ability to work in coordination with or in proximity to others without

distracting them or exhibiting behavioral extremes." (Reply, Doc. No. 13 at PageID 1941 (citing AR, Doc. No. 7-7 at PageID 774).) Plaintiff contends that "nothing in the [RFC] indicates that [Plaintiff] would be able to avoid others or not be within the proximity of others from 11% to 25% of the work day, or otherwise allow her to be unproductive for that amount of time." (Reply, Doc. No. 13 at PageID 1941.)

This contention is without merit. The ALJ's RFC precludes Plaintiff from working with the general public as part of her routine job duties and limits her to occasional interaction with coworkers and supervisors. (Decision, Doc. No. 7-14 at PageID 1312-13.) The ALJ defined "occasional interactions" as one-third of the workday. (*Id.* at PageID 1313.) These limitations are ***more*** restrictive than Nurse Seckman's opinion that Plaintiff is unable to "work in coordination with or in proximity to others" for up to twenty-five percent of the work day. Further, contrary to Plaintiff's argument, Nurse Seckman did not opine that Plaintiff would be off-task or unproductive during the time that she needs to avoid interacting with coworkers and supervisors. Finally, the ALJ was not required to adopt Nurse Seckman's recommended limitations verbatim.

Accordingly, the undersigned concludes that Plaintiff's contentions regarding the ALJ's analysis of Nurse Seckman's opinion are not well-taken.

### D.  The ALJ Did Not Err By Failing To Include A Limitation In The RFC For Superficial Interactions.

Plaintiff's final alleged error is that the ALJ should have accounted for the findings of the state agency psychological consultants by limiting her to "superficial" interaction. (SE, Doc. No. 10, at PageID 1918-19.) Plaintiff contests the ALJ's reasoning

that "the term 'superficial' was undefined and was a non-specific qualifying term that did not adequately describe a function consistent with current policy or regulation." (*Id.* at PageID 1918 (quoting Decision, Doc. No. 7-14 at PageID 1320).) Plaintiff acknowledges that the term "superficial" is not defined by the Social Security Administration or in the Dictionary of Occupational Titles (DOT) but contends that courts "have recognized that the term does have some vocational relevance." (*Id.* at PageID 1918-19.) For the reasons discussed below, Plaintiff's final alleged error is without merit.

The ALJ correctly stated that the Social Security Administration's policies and regulations do not define the term "superficial." Social Security Ruling (SSR) 83-10 provides definitions of terms and concepts that are frequently used in evaluating disability.[10] SSR 83-10, 1983 WL 31251 (S.S.A. January 1, 1983). "Frequent" is defined as "occurring from one-third to two-thirds of the time." 1983 WL 31251, at *6. "Occasional" is defined as occurring "from very little up to one-third of the time") (1983 WL 31251, at *5). There is no definition in the SSR for "superficial." The term is also not defined in the Dictionary of Occupational Titles (DOT), Social Security regulations, other SSRs, or HALLEX. Nor did the state agency psychological consultants define the term "superficial" in their assessments. (AR, Doc. No. 7-3 at PageID 271-84, 288-98.)

Plaintiff correctly notes that this Court has held that the term "occasional contact" refers to the ***quantity*** of time spent with individuals, but "superficial contact" goes to the

---

[10] Although SSRs do not have the same force and effect as statutes or regulations, they "are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)).

*quality* of the interactions. *See, e.g., Corey v. Comm'r of Soc. Sec.*, No. 2:18-cv-1219, 2019 WL 3226945, at *4 (S.D. Ohio July 17, 2019) (Vascura, M.J.) ("[R]eversal is warranted because the ALJ assigned significant weight to Dr. Marlow's opinions, but failed to include limitations for 'superficial' interactions.'"); *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-CV-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018) (Vascura, M.J.) ("'Occasional contact' goes to the *quantity* of time spent with [ ] individuals, whereas 'superficial contact' goes to the *quality* of the interactions." (emphasis added) (citation omitted))). In addition, the Sixth Circuit recently upheld a remand order that required the ALJ to adopt an RFC limitation for superficial interaction. *See Mabry-Schlicher v. Comm'r of Soc. Sec.*, No. 24-3811, 2025 U.S. App. LEXIS 14028, at **11-14 (6th Cir. June 6, 2025).

The Court need not reach the issue of whether the ALJ erred by declining to consider these cases. As noted above, the ALJ is not required to adopt verbatim the opinions and findings of medical providers and experts when formulating the RFC. *See, e.g., Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("[T]here is no requirement that an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."). More importantly, the ALJ explained that she gave only "some weight" to the opinions of the state agency psychology consultants and declined to incorporate their social limitations. (Decision, Doc. No. 7-14 at PageID 1320.) The ALJ gave "greater weight" to the opinion of Michael Lace, Psy.D., and relied primarily on his opinion to formulate the RFC limitations. (*Id.*) It was well within the ALJ's discretion to give more weight to the

opinion of Dr. Lace than the opinion of the state agency psychological consultants, and Plaintiff does not argue otherwise. Therefore, this argument is also not well-taken.

## V. CONCLUSION

Here, the ALJ provided reasonable explanations for why and how she weighed the medical opinion evidence, and her conclusions are supported by substantial evidence. The undersigned therefore recommends that the ALJ's decision be affirmed.

**IT IS THEREFORE RECOMMENDED THAT**:

1. Plaintiff's Statement of Errors (Doc. No. 10) be OVERRULED;

2. The Court AFFIRM the Commissioner's non-disability determination; and

3. The case be terminated on the Court's docket.

*s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is

based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).